**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHELIA ANNE HARRIS,

      *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant.*

_____/

CASE NO. 14-cv-14508

DISTRICT JUDGE MATTHEW F. LEITMAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 11, 12)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Harris is not disabled. Accordingly, **IT IS RECOMMENDED** that Harris' Motion for Summary Judgment (Doc. 11) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 12) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42

U.S.C. § 401 *et seq*. (Doc. 5; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 12).

Plaintiff Shelia Harris was forty-eight years old on her date last insured, June 30, 2011, alleging that she became disabled on September 20, 2010. (Tr. 187). This application was denied on December 5, 2011. (Tr. 87). Harris requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Patrick MacLean on December 18, 2012. (Tr. 50-86). Harris, who was represented by attorney Bethany Versical, testified, as did vocational expert ("VE") Dr. Lois Brooks. (*Id*.). On July 19, 2013, a second hearing was held before the same ALJ, in which Harris again testified, represented by Ms. Versical. (Tr. 35-49). On August 9, 2013, the ALJ issued a written decision in which he found Harris not disabled. (Tr. 19-30). On December 2, 2014, the Appeals Council denied review. (Tr. 1-3). Harris filed for judicial review of that final decision on January 6, 2015. (Doc. 1).

## B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

3

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

**D.    ALJ Findings**

Following the five-step sequential analysis, the ALJ found Harris not disabled under the Act. (Tr. 30). The ALJ found at Step One that Harris did not engage in substantial gainful between her alleged onset date, September 20, 2011, and her date last insured, June 30, 2011. (Tr. 24). At Step Two, the ALJ concluded that Harris had the following severe impairments: "bipolar disorder; left knee saphenous nerve injury; and obesity." (Tr. 24-25). At Step Three, the ALJ found that Harris' combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 25). The ALJ then found that Harris had the residual functional capacity ("RFC") to perform sedentary work, except that Harris

> must avoid all climbing ladders, ropes, and scaffolds. The claimant is able to perform occasional climbing of ramps/stairs, balancing, stooping, crouching, kneeling, and crawling. The claimant must avoid concentrated exposure to moving machinery and unprotected heights. The work must be limited to simple, routine, and repetitive tasks in a low-stress work environment with only occasional decision-making required and only occasional changes in the work setting. The claimant is able to have occasional interaction with the public and with co-workers.

(Tr. 26-28). At Step Four, the ALJ noted that Harris could not perform any past relevant work. (Tr. 28). At Step Five, the ALJ found that a significant number of jobs exist which Harris could perform despite her limitations. (Tr. 29). As a result, the ALJ found Harris not disabled under the Act. (Tr. 30).

**E.    Administrative Record**

**1.    Medical Evidence**

5

Harris argues that the ALJ erred in the evaluation of her mental health, but not her physical health. (Doc. 11 at 12-20). The Court will thus examine Harris' mental health records in detail, and will endeavor to provide an overview of Harris' physical health.

Harris treated with The Guidance Center in 2006. (Tr. 264-88). Large portions of these records are difficult to interpret due to poor scanning quality and penmanship. On February 5, 2006, Harris overdosed on prescription medication following an argument with her boyfriend. (Tr. 264). Harris reported feeling depressed, and described her desire to "sleep all day, feelings of guilt, minimal motivation to be awake and do household chores, frequent crying, feeling sad, [and] fleeting suicidal ideations." (*Id.*). She also described a history of depressive symptoms since age twelve, relationship troubles, and the abuse of "alcohol and caffeine pills to cope with stressors," resulting in rapid mood changes and anger. (*Id.*). On March 8, 2006, an unknown psychiatrist performed a psychiatric evaluation and assigned a GAF score of 50.[1] (Tr. 279). He or she also found that Harris' memory was fully intact. (Tr. 278). In September 2006 Harris reported that she was "doing better." (Tr. 268-69). From April through September of 2006 Harris it was noted that Harris did not suffer from delusions, suicidal or homicidal ideations, and reported no side effects from medications. (Tr. 267-75).

---

[1] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults. A GAF score of 41–50 indicates serious impairments in social or occupational functioning such as an inability to keep a job. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 (6th Cir. 2006); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders—Text Revision (DSM–IV–TR ) (4th ed. 2000).

On March 4, 2008, Harris visited Henry Ford Health System complaining of a lack of motivation and weakness resulting from depression. (Tr. 363). Dr. Yari Campbell continued Harris' prescription of Wellbutrin and added a prescription for Celexa and Ambien to help with depression and sleeplessness. (Tr. 364).

Harris visited Henry Ford Health System numerous times from 2008 through 2012 for treatment of breathing issues, spine pain, arm pain, leg pain, abdominal pain, dizziness, swollen glands, nail fungus, uterine bleeding, and a variety of other maladies. (Tr. 351-432).

Harris was treated in a hospital emergency ward on July 28, 2010, following a motor vehicle crash. (Tr. 442-51). Harris showed generally normal results on physical and x-ray examination of the left forearm, left knee, abdomen, brain, and chest. (*Id.*). An x-ray of the cervical spine showed no fracture or subluxation, but revealed [h]ypertrophic degenerative disease in the right facet joint at C4/C5 with associated neural foraminal narrowing." (Tr. 447).

In July 2011, Harris visited the Henry Ford Health System for treatment of knee pain, and received an injection. (Tr. 290-95). Her knee pain "responded to [the] saphenous nerve block," and Dr. Jason Schwalb recommended "exhausting all conservative management options." (Tr. 297).

On July 27, 2011, Harris underwent a new patient evaluation with Dr. Rana Lopa, who studied Harris' psychological maladies. (Tr. 299-303). Harris complained of "mood shifts, daily crying spells, irritability, low frustration tolerance, low energy, no motivation

7

and anhedonia for the last two years" along with concentration and memory problems. (Tr. 299). Dr. Lopa also noted that Harris was not fully candid regarding her history of chemical dependence, as she denied prior use of cocaine despite the presence of treatment records to the contrary. (*Id.*). Dr. Lopa found that Harris exhibited a guarded attitude, was depressed and anxious, had flat affect, moderate concentration and memory difficulties, and marginal judgment and insight. (Tr. 300). Dr. Lopa assigned a GAF score of 45. (Tr. 301).

Harris presented to Dr. Santosh Pillai on July 29, 2011, complaining of being "so depressed." (Tr. 304). She complained of concentration and memory deficits, and expressed feelings of sadness, hopelessness, and emptiness. (*Id.*). Harris suffered no memory or concentration problems, but experienced depression and some perceptual disturbances, including hearing a "female voice calling her name occasionally." (Tr. 306). She visited with Dr. Sarah Zamari on August 4, 2011, for an update wherein she was found to suffer from no memory or concentration problems, and was assigned a GAF score of 50. (Tr. 307).

Harris again visited with Dr. Pillai on August 15, 2011, wherein she reported sleeping better, experiencing more motivation to "take care [of] herself better," and began cleaning her bedroom and doing laundry. (Tr. 309). Her crying spells were "much better," and she had not experienced any similar episodes since her last meeting with Dr. Pillai. (*Id.*). No memory or concentration issues were noted, and Harris reported being in a good mood. (Tr. 310). However, Harris was also noted to "have problems with paranoia

8

and being around crowds and occasionally hears voices calling her name." (*Id*.). On August 22, 2011, her GAF score was upgraded to 55.[2] (Tr. 311).

On September 21, 2011, Harris reported that "things [were] going well," and that she continued to have the motivation to "get up and do things." (Tr. 333). She reported some "phantom pains" in the left knee and thigh area. (*Id*.). She was assigned a GAF score of 60. (Tr. 335).

On October 5, 2011, Harris reported that her mood was "mostly good," her energy had been "up and down," and that she had been "spending time with her family." (Tr. 331). She denied any memory problems or concentration problems. (*Id*.).

On December 28, 2011, Harris reported feeling unmotivated to leave the house or clean her home, and complained of paranoia. (Tr. 328). Dr. Rana assigned a GAF score of 60. (Tr. 329).

On January 18, 2012, Harris' GAF score was assessed at 45. (Tr. 324). She reported being in a "low mood," with decreased energy and a desire to self-isolate. (Tr. 326). On February 20, 2012, her GAF score was upgraded to 60. (Tr. 322). On May 2, 2012, Harris reported that her mood was "pretty good," she was sleeping well, and had not suffered recent panic attacks, but that her energy levels were "sucky." (Tr. 318).

On May 16, 2012, social worker Jean-Marie El-Fakhoury concluded that Harris exhibited euthymic mood, fair energy, and good sleep, but with "superficial participation in therapy." (Tr. 348).

---

[2] A GAF score of 51–60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. DSM–IV–TR

On June 20, 2012, Harris reported increased depression, including the lack of desire to "leave her bed much." (Tr. 345). Social worker El-Fakhoury found that Harris' speech was slow, her mood depressed, and that she suffered from moderate concentration and memory deficits. (*Id*.). The social worker noted that Harris was not engaged, and had low motivation to participate, along with limited insight. (Tr. 347).

On August 13, 2012, Harris underwent a psychological evaluation with Dr. Zamari. (Tr. 341-43). Harris reported sometimes hearing a male voice telling her to shoplift, particularly when depressed, along with occasional delusions of being followed. (Tr. 341). Harris also described "panic attacks at times characterized by getting shaky, sweating under her arms, heart pounding, [and] shortness of breath." (*Id*.). Her mood was found to be "pretty good," and she was found to be "forgetful at times," but she did not suffer from any concentration problems. (Tr. 342). Dr. Zamari assigned a GAF score of 55. (Tr. 343).

On August 21, 2012, social worker El-Fakhoury drafted a letter verifying that Harris "continues to attend therapy, is compliant with medications and makes progress towards her behavioral health goals." (Tr. 338). Harris reported that she was recently arrested for the fourth time for shoplifting, and sometimes felt a voice telling her to "pick that up." (Tr. 339). El-Fakhoury noted that Harris had not complained of these voices or urges in the past, and that Harris was "unmotivated and disinterested." (*Id*.).

On September 24, 2012, Harris reported being in a low mood and was found to "look more disheveled than usual." (Tr. 336). Social worker El-Fakhoury noted that

Harris had refused a treatment appointment, and "confronted [Harris] regarding her lack of participation during sessions and expressed concern regarding her level of functioning." (Tr. 336). Harris had mild concentration and memory problems, but her mood was eurythmic. (*Id.*). Social worker El-Fakhoury found that Harris displayed "clinically significant symptoms including a depressed affect, feelings of hopelessness, low energy/motivation, occasional auditory hallucinations, chronic paranoid thinking and fatigue." (*Id.*).

## 2.    Medical RFC Assessments

On March 19, 2012, Harris underwent a mental RFC assessment with Dr. Elaine Tripi. (Tr. 312-13). Harris was found to be moderately limited in the following areas: remembering locations and work-like procedures; understanding and remembering short and simple instructions; carrying out very short and simple instructions; sustaining ordinary routine without special supervision; asking simple questions or requesting assistance; maintaining socially appropriate behavior; responding appropriately to changes in the work setting; being aware of normal hazards; and setting realistic goals or making plans independently of others. (Tr. 312-13). She was found to be markedly limited in the following areas: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; working in coordination with others or proximity to others; completing a normal workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public;

11

accepting instructions and responding to criticism from supervisors; getting along with coworkers or peers; and traveling to unfamiliar places or using public transportation. (Tr. 312-13). Finally, she was found to have no significant limitation in terms of making simple work-related decisions. (Tr. 312). Dr. Tripi assigned a GAF score of 46, and concluded that because of Harris' age and lack of progress with therapy, she was "not a viable rehabilitation candidate, nor is she capable of sustaining substantial gainful work activity." (Tr. 315).

On January 22, 2013, Harris visited Monarch Evaluation Services, Inc. for a mental status examination under the care of Dr. Hugh Bray. (Tr. 433-41). Dr. Bray noted that Harris "arrived by car, alone," that she "needed no assistance in preparing for the appointment," and that she "primarily provided all of her own data." (Tr. 433). Harris reported that her mental illnesses caused her to "do crazy things like shoplift and have sex with different people," and that she had suffered such symptoms for about ten years. (*Id.*). Harris further asserted that she "mostly stay[s] in the bed unless [she] absolutely ha[s] to do something," and watches television or sleeps rather than interacting with others. (*Id.*). When asked what prevents her from working, she stated that she would "miss too many days" because, apparently in reference to her depression, "some days [are] ok, other days [are] not." (Tr. 434). She reported having fair relations with her family, neighbors, co-workers, employers, and the examining physician Dr. Bray, but had good relationships with friends. (Tr. 435). In the past, she enjoyed playing Farmville on the computer, but at the time of the examination her only reported interest was watching

television. (*Id*.). Regarding personal care, Harris stated that she "wash[es] up," but had not had a bath or shower in eight to nine months, that she performed light housekeeping, cooked simple meals, went shopping, cashed checks, drove her car, watched television, ran errands, and made appointments. (Tr. 436). Dr. Bray noted that Harris exhibited adequate contact with reality, had diminished self-esteem, no unusual or bizarre behaviors, appropriate involvement with the interview, did not exaggerate or minimize symptoms, showed adequate insight and judgment, and was cooperative and responsive, including maintaining sufficient eye contact. (*Id*.). Harris denied delusions, but reported seeing and hearing "shadows" that appear while she is lying down in her room. (*Id*.). Dr. Bray found her to be distant and withdrawn, with an apathetic mood. (*Id*.). Tests of Harris' mental state showed normal results in terms of memory, mental capacity, sensorium, bank of information, abstract thinking, similarities and differences, and judgment. (Tr. 437). This included the ability to name three objects three minutes after they were removed from her vision, name five large cities, recall the date, and interpret sayings. (*Id*.). Dr. Bray found that Harris' concentration, attention, persistence, and effort were average on the day of testing. (*Id*.). He diagnosed schizoaffective disorder, mood disorder, and rendered a GAF score of 60. (Tr. 437-38). Dr. Bray's prognosis was fair to guarded. (Tr. 438). He found that Harris' "mental ability to relate to others, including fellow workers and supervisors" was moderately impaired, that her ability to understand, remember, and carry out tasks was mildly impaired, that Harris "could handle more complex tasks," and that "[d]ifficulty in performing multiple step tasks is likely to be

13

minimal," that her ability to maintain attention, concentration, pace, and effort was mildly impaired, and that Harris' ability to "withstand stress and pressure associated with day to day work activities" was mildly impaired. (*Id.*). Finally, Dr. Bray asserted that none of Harris' "other capabilities" were affected by her impairment. (Tr. 440).

### 3.   Application Reports and Administrative Hearing

### a.   Harris' Function Report

Harris completed a function report on September 16, 2011. (Tr. 214-21). There, Harris asserted that she is unable to work as a result of "Bipolar Disorder, depression, PTSD from an abusive childhood and extreme paranoia" in addition to "breakdowns," depression and suicidal thoughts, sleepiness, and headaches. (Tr. 214). Harris reported that she spends her days either pacing around due to restlessness, or sleeping due to depression. (Tr. 215). She asserted that she experiences pain, panic attacks, and anxiety, which sometimes interrupt her sleep. (*Id.*). In terms of personal care, Harris reported that her "depression episodes" sometimes limit her ability to bathe, feed herself, shave, and perform other care activities. (*Id.*). She sometimes needs a reminder to get out of bed or to take pills. (Tr. 216). She cooks "[e]asy meals" depending on "[the] day and how I feel," and performs "[e]asy tasks" around the house, like wiping counters, but sometimes performs no chores for days or weeks. (*Id.*). Harris stated that she can go out alone, but generally stays home due to feeling "paranoid around people." (Tr. 217). She is able to drive, but prefers not to do so because of paranoia; she sometimes visits stores for household goods and food, but generally "stay[s] home and isolate[s]" herself. (*Id.*). She

14

further reported that her bipolar disorder results in "impulsive and then forgetful" spells, such that she is unable to pay bills. (*Id*.). In terms of hobbies, she reported "some days no hobbies or interests. I get so depressed, I lose all will to live," whereas "[o]ther times, maybe reading, being with family." (Tr. 218). She spends time with her husband, and family members occasionally visit her. (*Id*.). In terms of physical limitations, Harris asserted that her "[p]ain makes it difficult to lift [or] stand," and that even "sitting can be hard, too." (Tr. 219). Regarding mental limitations, she asserted that she becomes "restless" and will "forget to do things," along with difficulty focusing such that she feels like she is "all over the place." (*Id*.). She can pay attention for "[v]ery short periods," does not finish what she starts, and regarding her ability to follow written instructions, she wrote "bad." (*Id*.). Harris corroborated this assertion by failing to complete large segments of the function report form. Regarding unusual fears, she reported that she fears "[g]oing outside, being in crowds or around people" because she "get[s] real nervous and paranoid." (Tr. 220).

### b.    Harris' Testimony at the Administrative Hearing

At the December 18, 2012, hearing before the ALJ, Harris testified that she lives in a second floor apartment, and must lean on a wall to climb the stairs to reach her home. (Tr. 58). Harris stated that she does not leave home frequently, perhaps once per week. (*Id*.). She washes some clothing in the sink rather than traveling two flights of stairs down to the laundry room in her building because of knee pain. (Tr. 60-61). However, she later testified to being able to perform all of her own personal needs, including

15

bathing, brushing her hair, and dressing without assistance. (Tr. 62). Harris asserted that she goes grocery shopping weekly, and is able to drive, but prefers not to do so. (*Id*.). She also testified that she helps her husband with household chores "[m]aybe three times out of the week," and otherwise does not participate in chores because she is "usually in the bed." (Tr. 75-76). However, she also asserted that she generally spends six days a week in bed "from 7:00 a.m. to the next day. I just stay in the bed all day," and only gets up "to go use the restroom . . . or to go answer the phone." (Tr. 76). Harris testified that she had been fired from her prior position as a receptionist because of knee pain following a car accident, and was unable to secure work as a nail technician because she could not work quickly enough. (Tr. 63, 67-68). When asked whether she could work as a receptionist, Harris testified "probably so," if she could "get rid of the paranoia." (Tr. 68). The ALJ inquired into Harris' physical condition and her ability to sit and lift, but Harris asserted that the main problem keeping her from working was "[t]he depression and the bipolar." (Tr. 73, 78-80). Harris asserted that her memory was "a little slow," and that she is sometimes able to follow television programs like the news, but other times finds herself dozing off. (Tr. 74). She is able to use a computer, but chooses not to do so. (*Id*.). Harris confirmed that her paranoia results in problems trusting others, but, she also stated that this mistrust is generally directed towards crowds, and that she has a "good" relationship with her husband and family members. (Tr. 75). She stated that she sometimes suffers from panic attacks when "in a crowded area . . . like at the supermarket," because she feels "that somebody's watching me or too close, and [she will] start to perspire." (Tr.

16

77). However, she clarified that she does not experience panic attacks when outside the home in an uncrowded area. (Tr. 77-78). When asked why she generally refuses to leave home, Harris testified "I really couldn't tell you. I don't know why I don't. Other than I just don't want to go nowhere." (Tr. 78).

At the July 19, 2013, hearing before the ALJ, Harris reported that she was doing "[t]he same" as she was during the first hearing. (Tr. 39). She reported that she continued to "stay in the bed all the time," does not take full showers or baths, and does little besides lie in bed in the dark. (Tr. 40). Harris confirmed that she had missed appointments due to her paranoia "[a] couple of times" within the two months prior (Tr. 41). Harris also asserted that her sleep quality had deteriorated, and that she sometimes went several days without sleep. (Tr. 42). Harris stated that she becomes nervous at the idea of working full time because she felt that she would "go through the same problems of people plotting against me like they did at . . . my last job," though she did not attribute this nervousness to paranoia. (Tr. 42-43). When asked whether she would be able to leave home to attend work every day, Harris testified that doing so would be "real hard" because she could not get a ride and "do[es not] really like driving." (Tr. 43). She also asserted that she has experienced trembling in her hands since she was eleven or twelve years old. (Tr. 44). Harris confirmed that she can "somewhat" follow television programs she watches, but that when reading she must "go over the pages a couple of times" to understand the contents. (Tr. 46). Harris stated that she still hears voices speaking to her on occasion, and recently believed that her husband was calling to her

17

when he was not there. (Tr. 46-47). She further asserted that "my aunt told me that I shouldn't be worried because it's just God talking to me." (Tr. 47).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ then asked the VE a series of questions to determine Harris' ability to perform work. (Tr. 80-85). The ALJ asked the VE to consider whether a hypothetical worker, who has the same education, age, and past work experience as Harris could perform competitive work. (Tr. 81). Specifically, the ALJ asked the VE to hypothesize a person who has the ability to perform light work, and who is subject to the following restrictions:

> No climbing ladders, ropes or scaffolds, occasionally climb ramps or stairs. Occasionally balance, stoop, crouch, kneel, and crawl. Avoid concentrated use of machinery. Avoid concentrated exposure to unprotected heights. And his work would be limited to simple, routine, and repetitive tasks, employed in a low-stress job, defined as having only occasional decision making required, only occasional changes in the work setting, with only occasional interaction with the public and with co-workers.

(Tr. 81-82). The VE testified that such a worker could not perform Harris' past relevant work as a nail technician, which was semi-skilled work, whereas the hypothetical worker is limited to unskilled work. (Tr. 82). The VE then confirmed that such a worker could perform assembly jobs (726,000 nationally), visual inspection jobs (198,000 nationally), and packaging jobs (429,000 nationally). (*Id.*). The ALJ then modified the hypothetical such that the worker would be limited as follows: "this hypothetical individual is able to lift up to ten pounds occasionally, standing or walking for approximately two hours per

18

eight-hour workday, and sitting for approximately six hours per eight-hour workday, with normal breaks," and also asked the VE to incorporate all those nonexertional limitations from the first hypothetical. (*Id*.). The VE replied that such a worker could perform some assembly jobs (198,000 nationally), some visual inspector jobs (99,000 nationally), and some packaging jobs, (138,000 nationally). (Tr. 83). The ALJ then added that the hypothetical worker would be off task more than twenty percent of the time; the VE confirmed that such a restriction would be work prohibitive. (*Id*.). The VE further asserted that workers are generally provided with two fifteen minute breaks during an eight-hour workday, that employers would accept a maximum of two absences from work per month, and that exceeding these limits on a regular basis would eliminate all competitive work. (Tr. 84). Harris' attorney then inquired as to whether a limitation to occasional use of the hands because of shakiness would preclude any competitive work, and the VE confirmed that it would. (Tr. 85).

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an

19

impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both   "acceptable"   and   non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic

20

techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

22

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)   [D]aily activities;
> (ii)  The location, duration, frequency, and intensity of . . . pain;
> (iii) Precipitating and aggravating factors;
> (iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
> (v)   Treatment, other than medication, . . . received for relief of . . . pain;
> (vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her]

23

limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Harris argues that the ALJ erred in the following ways: 1) inaccurately characterizing Harris' medical records by finding that she failed to participate in mental health treatment until one month after her date last insured; 2) failing to determine whether there was a justifiable cause for Harris' failure to seek treatment; 3) ignoring evidence regarding Harris' mental condition produced after her date last insured; and 4) failing to account for Harris' moderate limitations in concentration, persistence, and pace due to poor memory and short attention span. (Doc. 11 at 12-20). These arguments will be addressed in turn.

### 1.    *The ALJ Did Not Mischaracterize Harris' Mental Treatment Records*

First, Harris argues that the ALJ undersold the frequency and seriousness of her mental health treatment, and thus improperly understated the seriousness of her mental disorders. (Doc. 11 at 12-15). Harris quotes the ALJ's decision wherein he stated, in relevant part:

> "The record showed complaints of depression and bipolar disorder since at least 2006 but there are issues with non-compliance and inconsistent treatment for depression. . . . The claimant was referred to psychiatric treatment in February 2010 but treatment notes dated through November

24

> 2010 showed that the claimant still had not attended any therapy . . . . in fact, the claimant failed to participate in any mental health treatment until one month after her date last insured in July 2011, which suggests that her symptoms were not interfering in her daily activities until that time."

(Tr. 27). Harris asserts that "[t]his is a vastly understated account of the record" of her mental health treatment. (Doc. 11 at 13). She cites medical records stretching back to her 2006 visits to The Guidance Center which show both depression and bipolar disorder in addition to reports that she wanted to sleep all day, had feelings of guilt, minimal motivation to do household chores, crying spells, sadness, paranoid delusions, and suicidal tendencies. (*Id.*). Recognizing the sparseness of her mental health records in 2008 and 2009, Harris notes that she "did treat at times and often included issues with depression or insomnia in her reports to the treating staffs [sic]." (*Id.*). Harris counts four occasions during these years in which she referenced depression, insomnia, bipolar disorder, or anxiety during treatment at Henry Ford Health System. (*Id.* at 13-14). She also notes one record in May 2011 wherein she referenced chronic insomnia, fatigue, and sleepiness. (*Id.* at 14). Harris thus concludes that the ALJ's characterization of this record as reflecting "very little treatment during the relevant time period between the alleged onset date of disability and the expiration of claimant's date last insured" is inaccurate (*Id.* at 13-15; Tr. 28).

The Commissioner argues that Harris received no mental health treatment between her alleged date of disability and date last insured, and that in the broader 2006 to 2011 period her treatment ranged from "sporadic to nonexistent." (Doc. 12 at 7). This argument over the definition of the word "inconsistent" is something of a sideshow,

because the ultimate question the Court must answer is whether Harris has demonstrated that she was disabled during her period of DIB eligibility, and ultimately whether the ALJ's decision is supported by substantial evidence. This analysis must be conducted on a holistic basis, comparing not merely the number of treatment sessions but also the findings of the physicians in those sessions, the consistency of Harris' alleged symptoms, her credibility, and other relevant evidence. To this end, the Court will examine the ALJ's mental impairment findings in detail.

The ALJ found that Harris suffered from "mild" restrictions in terms of activities of daily living and social functioning, noting that she was able to "maintain her own personal needs and grooming/hygiene with some reminders, take medication using reminder notes, prepare simple meals for herself, shop in stores for food, and socialize with friends and family." (Tr. 25). He also noted that she has moderate limitations in concentration, persistence, and pace "due to poor memory and short attention span." (*Id*.). Harris does not explicitly dispute these characterizations, and they are well supported by the medical records. Harris did not treat for any mental conditions between her alleged onset date and date last insured. Those treatment sessions she cites prior to this period also do not corroborate her allegations. Harris was treated in early 2006 following a suicide attempt, but a relatively moderate GAF score of 51 was assessed just weeks thereafter. (Tr. 264-67). Harris' March 5, 2008, treatment notes reflect that she was started on an antidepressant medication one month prior; she no longer experienced suicidal ideation, but had not experienced an increase in motivation; she was prescribed a

26

second anti-depressant medication. (Tr. 363-64). Harris treated for breathing issues in October 2008, and noted that her depression issues had improved. (Tr. 357). In December 2008 Harris returned for a check-up following surgery, and merely noted that she had "great difficulty sleeping," and that "the only [medication] that has helped her [depression] recently is Xanax." (Tr. 354). In February 2009 she sought treatment for nail fungus, and also complained of difficulty sleeping. (Tr. 349). In October 2009 she sought treatment for "depression and anxiety," particularly complaining of crying spells, fatigue, tiredness, and increasing anxiety." (Tr. 404). She "attributed this to multiple factors" including stressful training as a nail technician and that she was "going through a portion of bankruptcy in her family." (*Id.*). Harris confirmed that she was no longer experiencing suicidal tendencies, but "has been crying a lot," and "sometimes she hears people whispering and talking to her." (Tr. 404). Dr. Campbell cautioned Harris that she "really needs to follow up with Behavioral Services," apparently indicating that she had not sought regular treatment for her depression symptoms. (*Id.*). Medical records indicate that Harris apparently did not seek treatment for her mental health from October 2009 until May 2011, at which time she again mentioned sleep issues during a follow up appointment regarding lymphadenitis and furuncle of the neck; Harris made no mention of her depression symptoms during that treatment session. (Tr. 391-92). While Harris' treatments after her date last insured are not highly probative of her wellbeing during the relevant period, they can be used to demonstrate that her prior treatment notes are representative of her overall wellbeing. While Harris reported feelings of depression,

27

memory deficits, hopelessness, emptiness, and hearing voices in July 2011 (Tr. 304-06), she reported better sleep, more motivation, good mood, and no concentration or memory issues in August 2011 (Tr. 309-10), and stated that "things [were] going well" and that she had the motivation to "get up and do things" in September 2011. (Tr. 333-34). Harris experienced, by her own estimation, some "up and down" times during late 2011 and early 2012 (Tr. 331), including occasional paranoia and lack of motivation (Tr. 326-28, 345, 341-43), but also sometimes reported improvements in sleep quality, the elimination of panic attacks, and an improving mood. (Tr. 318, 342, 338).

As the ALJ properly noted, Harris also showed fairly consistent improvement in her GAF score throughout her treatment sessions. (Tr. 27). In 2006 Harris' GAF score was rated at 50 (Tr. 279), between July and December 2011 it registered at 45, 50, 55, and 60 (Tr. 301, 307, 311, 335, 329), and in 2012 it ranged from 45 to 60; in her last visit was assessed at 55. (Tr. 324, 322, 343). In her March 2012 RFC assessment, Dr. Tripi rated Harris' GAF score at 46 (Tr. 315), and in his January 2013 RFC assessment Dr. Bray rated it at 60 (Tr. 437-38). No GAF scores were produced in the relevant period between Harris' alleged onset date of September 20, 2010, and her date last insured, June 30, 2011. However, it is clear from the general trend that Harris' mental health condition was on the upswing throughout her mental health treatment. In short, the available medical evidence simply does not support the degree of limitation which Harris asserts. Rather, it demonstrates that Harris has made significant strides in combatting her depression, and has sought only occasional treatment over the course of several years.

28

As the ALJ also correctly noted, Harris' reported activities of daily living do not corroborate the alleged severity of her mental conditions. (Tr. 25). Harris asserted at the first hearing before the ALJ that she is able to perform all personal grooming activities without assistance, grocery shops weekly, helps perform chores around the house thrice weekly, can drive, gets along well with family, and is sometimes able to follow the proceedings of television programs. (Tr. 62-75). At the second hearing, she further states that she is capable of reading books, but must sometimes "go over the pages a couple of times." (Tr. 46). In her function report, Harris reported that she enjoys spending time with family. (Tr. 218). The ALJ used these inconsistencies to impugn Harris' credibility. As the Court will examine below, this too was proper.

### 2.     The ALJ Did Not Err By Failing to Apply SSR 82-59

Harris next argues that the ALJ erred by failing to "determine whether there was a 'justifiable cause' for the noncompliance before using it to discredit or deny her claim" pursuant to SSR 82-59. (Doc. 11 at 16). She further argues that the ALJ "did not consider whether the plaintiff's lack of further treatment might have been caused by the very condition that necessitated the treatment" because her "panic disorder and agoraphobia . . . would (or at least could) have prevented her from leaving home to seek treatment when not absolutely essential." (*Id*.). The speculative phrasing of this argument is not mere coincidence; while several medical providers opined that Harris failed to attend or put much effort forth in treatment sessions, none of them suggested that her mental

29

conditions might be the cause of those failings. Regardless, Harris' argument fails because SSR 82-59 simply does not apply. SSR 82-59 provides:

> An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability.

S.S.R. 82–59, 1982 WL 31384, at *1. Thus, [f]inding that a claimant has a disabling impairment is the necessary trigger for an analysis under SSR 82–59." *Baker v. Astrue*, No. 3:09-CV-405, 2010 WL 1818045, at *5 (S.D. Ohio Apr. 15, 2010); *see also Mullen v. Comm'r of Soc. Sec.,* No. 13-14479, 2015 WL 1530778, at *7 (E.D. Mich. Mar. 31, 2015). The ALJ did not find that Harris would be under a disability but for her failure to seek treatment, but rather used her failure to seek treatment as one factor in discounting the credibility of her alleged symptoms. (Tr. 27-28). Specifically, the ALJ found that the "nature and frequency" of Harris' mental health treatment was inconsistent with claims and that the "scant findings" from those treatment sessions showed that her symptoms were of a "moderate nature that were treated conservatively." (Tr. 28). An ALJ may consider the frequency and type of treatment a claimant seeks in determining the credibility of his or her alleged symptoms because "[i]n the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004); *see also McKenzie v. Comm'r of Soc. Sec.*, No. 13-CV-11272,

30

2014 WL 4793884, at *4 (E.D. Mich. Sept. 25, 2014). The ALJ did precisely that, and thus did not err.

### 3.   *The ALJ Did Not Err by Giving Little Weight to Medical Records Produced After Harris' Date Last Insured*

Next, Harris argues that the ALJ erred by "effectively ignor[ing] all the evidence concerning plaintiff's mental condition after her date last insured, giving it all 'limited weight.'" (Doc. 11 at 17). The Sixth Circuit has firmly established that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 379 (6th Cir. 2013). Such evidence is relevant only insofar as it "relates back" to the insured period, which is to say insofar as it demonstrates that the claimant was actually disabled during the insured period. *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). If the claimant becomes disabled after their date last insured, the claim must be denied. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Harris' records are similar to those examined in *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004), wherein the Sixth Circuit noted that "even after the expiration of Claimant's insured status, medical evidence suggested his ability to engage light to moderate work. But more importantly, as to the relevant time period, there is substantial evidence for the ALJ's conclusion that Claimant was capable of a limited range of medium level work." As discussed above, both the medical evidence produced before Harris' date of alleged disability and after her date last insured support the ALJ's conclusion that she is not disabled, and no medical evidence was produced between those dates. The ALJ thus

31

properly gave little weight to the evidence produced after Harris' date last insured, and no evidence suggests that she was disabled at any point.

### 4.      *The ALJ Did Not Fail to Account for Harris' Moderate Limitations to Concentration, Persistence, or Pace*

Finally, Harris argues that the ALJ erred by recognizing that she experiences "moderate limitations to concentration, persistence, and pace due to poor memory and short attention span" but failing to appropriately account for those limitations in the RFC assessment. (Doc. 11 at 18; Tr. 25). Specifically, Harris argues that the ALJ's restriction to "simple, routine, and repetitive work with limited dealing with the public" cannot compensate for her moderate concentration and memory deficits. (*Id*.). She also argues that the jobs the ALJ found she could perform "would require at least some degree of concentration in order to permit the appropriate completion of the tasks involved, within quota. Adding in a finding of memory loss would be equally important. [Thus a] limitation to simple, routine, and repetitive work does not address the degree of limitation necessitated by the ALJ's own findings." (*Id*. at 19-20). The question of whether restrictions similar to these can accommodate a finding of moderate limitations to concentration, persistence, or pace have been addressed frequently in this district. Restating the history of those cases once again would be unnecessarily duplicative. *See Leidlein v. Comm'r of Soc. Sec.*, No. 14-10718, 2015 WL 1439810, at *9 (E.D. Mich. Mar. 27, 2015) (collecting cases); *Brewer v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14039, 2011 WL 7546792, at *12 (E.D. Mich. Dec. 11, 2011) (same); *McNamara v. Comm'r of Soc. Sec.*, No. CIV.A. 11-10331, 2011 WL 7025855, at *12 (E.D. Mich. Dec. 1, 2011)

(same). Suffice it to say that "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682 at * 7 (E.D. Mich. May 17, 2011). Courts have found no error where there is an "inconsistent record of difficulties with concentration, persistence or pace" and where there is a "dearth of evidence . . . that Plaintiff's 'moderate' CPP rating would preclude her from performing all simple work." *Brewer v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14039, 2011 WL 7546792, at *12 (E.D. Mich. Dec. 11, 2011); *see also Mortzfield v. Comm'r of Soc. Sec.*, No. 12-15270, 2014 WL 1304991, at *10 (E.D. Mich. Mar. 31, 2014).

As always, the claimant bears "the ultimate burden to establish an entitlement to benefits by proving the existence of a disability." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 674 (6th Cir. 2009) (quotation omitted). Harris does not point to any portion of the record establishing that even a limitation to "simple, routine, and repetitive tasks in a low-stress work environment with only occasional decision-making required and only occasional changes in the work setting . . . [with] occasional interaction with the public and with coworkers" is insufficient to compensate for her mental limitations. (Tr. 26). Instead, she simply relies on the fact that the ALJ found that she has "moderate" CPP limitations due to "poor memory and short attention span." (Doc. 11 at 18; Tr. 25). Like the plaintiff in *Brewer*, Harris' memory and concentration issues appear to have been

33

sporadic. In July 2011 Harris was found to have moderate memory and concentration difficulties (Tr. 300); and in August and October 2011 she had no memory or concentration issues (Tr. 310, 331); in June 2012 she had moderate issues (Tr. 345); in August 2012 she was "forgetful at times" but had no concentration issues (Tr. 342); and in September 2012 she had mild memory and concentration issues (Tr. 336). Given these inconsistent findings of mild, moderate, or non-existent memory and concentration problems, medical evidence simply does not support Harris' assertion that she is unable to complete simple, routine, repetitive tasks in a low-stress environment. The ALJ's RFC assessment accurately captures Harris' limitations. The ALJ's decision is thus supported by substantial evidence.

### H.     Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Harris' Motion for Summary Judgment (Doc. 11) be **DENIED**, the Commissioner's Motion (Doc. 12) be **GRANTED**, and that this case be **AFFIRMED**.

## III.     <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S.

140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 7, 2015                    S/ PATRICIA T. MORRIS
                                         Patricia T. Morris
                                         United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 7, 2015                    By s/Kristen Krawczyk
                                         Case Manager to Magistrate Judge Morris